**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. ____________**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**TRAVEL + LEISURE CO.,**

**Defendant.**
________________________________________/

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**
**AND DEMAND FOR JURY TRIAL**

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## I. INTRODUCTION

1. From October 2019 through February 2021 ("Relevant Period"), Travel + Leisure Co. ("Travel + Leisure"), the largest timeshare company in the world, made misstatements and omissions about two undisclosed projects in which it rescinded thousands of customer timeshare loans that were already seriously past due or in default. By granting customer requests for these rescissions, letting customers out of their loans, and issuing refunds, Travel + Leisure improved the performance of certain important loan portfolio measures. These included its loan loss provision, which is the company's publicly disclosed estimate of defaulted loan amounts ("Loan Loss Provision"), as well as an important measure in its earnings reports, the Loan Loss Provision as a percentage of gross vacation ownership interest sales, net of fee-for-service sales ("Loan Loss Provision Percentage").

2. Although Travel + Leisure was aware of the significance of these measures and projected improvements to the Loan Loss Provision Percentage from these rescissions, it negligently failed to disclose the projects to investors. As a result, Travel + Leisure's required Commission filings and earnings calls left out material information, presenting a misleading picture of the condition of Travel + Leisure's loan portfolio and misleading portrayal of the reasons for improvements in both the Loan Loss Provision and the Loan Loss Provision Percentage.

3. Travel + Leisure failed to disclose to investors two projects under which it granted rescissions to customers with delinquent and defaulted timeshare loans who wanted to exit their timeshares: (i) the Special Handling Project ("SHP"), which began in May 2019; and (ii) the Past-Due Project ("PDP"), which began in August 2019 (collectively, "Projects"). Both were designed to identify and rescind loans where the loans were delinquent or defaulted and customers had requested rescission, including loans Travel + Leisure had previously chosen not to rescind because customer complaints did not justify rescission or because the statutory rescission period had long expired.

4. Under the SHP, Travel + Leisure set targets for how many delinquent or defaulted loans it needed to rescind each quarter to keep its Loan Loss Provision Percentage within the guidance it had announced to investors. Under the PDP, Travel + Leisure compiled spreadsheets of delinquent and defaulted loans linked to customer complaints and rescinded those loans in bulk without any individual review by Travel + Leisure's Sales Reversal Committee, which reviewed and approved rescission requests received after the statutory rescission period. Once a loan was coded for rescission under the Projects, Travel + Leisure refunded the customer's payments on the loans, stopped all collection efforts, and, in cases of deeded timeshare contracts, asked the customer to return the timeshare deed. Despite forecasting the anticipated impact of rescinding

past due loans on its Loan Loss Provision Percentage and defaults, Travel + Leisure did not track the Projects' actual impacts on its financial statements.

5. In total, from May 2019 to at least December 2020, Travel + Leisure rescinded more than 2,900 delinquent or defaulted loans through the Projects, totaling about $77 million in loan balances, including roughly $34 million of defaulted loans. Most of these loans were months or even years old when rescinded, and all the loans were rescinded beyond the average five to seven-day statutory period for rescission typically afforded to consumers by state law.

6. Under both the SHP and PDP, once Travel + Leisure decided to rescind these contracts, it reversed them in its accounting system as if the loans had never been made. For the loans involved in the Projects, that meant undoing the original revenue from the sale, undoing the Loan Loss Provision it had previously recorded, and reversing the defaulted amounts for loans that were defaulted at the time of rescission.

7. Rescinding these loans materially improved Travel + Leisure's publicly disclosed Loan Loss Provision and Loan Loss Provision Percentage for several fiscal quarters in 2019 and 2020. These measures were important to investors because they reflected how well Travel + Leisure's loan portfolio was performing and how much of that portfolio was estimated to be collectible. By eliminating non-performing loans from the portfolio through the Projects without disclosure, Travel + Leisure presented a misleading picture of the performance of its loan portfolio. Despite the meaningful effect these rescissions had on certain important performance measures, Travel + Leisure never tracked the actual impact of the Projects and never told investors about the Projects. Instead, when asked on certain earnings calls why its Loan Loss Provision Percentage had improved, Travel + Leisure credited changes like customer-care initiatives, stricter underwriting, or operational improvements. None of these explanations mentioned the

undisclosed practice of granting rescission requests for aged, delinquent, or defaulted loans under the Projects.

8. Because it failed to disclose the Projects and the benefits they provided, Travel + Leisure's Commission filings and public statements gave investors an incomplete account of the key factors affecting its Loan Loss Provision and Loan Loss Provision Percentage. As a result, Travel + Leisure's disclosures during this period were materially misleading.

9. As a result of the conduct alleged in this Complaint, Travel + Leisure violated Sections 17(a)(2) and (a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(2)-(3)] and Section 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 13a-1, 13a-11, and 13a-13].

10. Unless enjoined, Travel + Leisure will continue to violate the federal securities laws. Among other relief, the Commission seeks permanent injunctive relief and a civil penalty against Travel + Leisure.

## II. DEFENDANT

11. Travel + Leisure (f/k/a Wyndham Destinations, Inc. and Wyndham Worldwide Corporation) is a global provider of vacation membership and leisure travel products and is incorporated in Delaware with its principal place of business in Orlando, Florida. Travel + Leisure's common stock has been registered under Section 12(b) of the Exchange Act and listed on the New York Stock Exchange since 2006.

## III. JURISDICTION AND VENUE

12. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].

13. This Court has personal jurisdiction over Defendant and venue is proper in the Southern District of Florida pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b), (c), and (d). Among other contacts, during the time of the violative conduct alleged herein, Defendant maintained multiple vacation ownership resorts in this District where it conducted vacation ownership business, including marketing, selling, financing, and servicing vacation ownership contracts. Defendant's resorts in this District include, among others, Club Wyndham Palm-Aire (Pompano Beach), Club Wyndham Santa Barbara (Pompano Beach), Club Wyndham Sea Gardens (Pompano Beach), and Club Wyndham Royal Vista (Pompano Beach). Defendant also solicited investors at investor meetings within this District and certain of Defendant's investors have offices in this District. Further, numerous customers of Travel + Leisure reside in this District.

14. In connection with the conduct alleged in this Complaint, Defendant, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, or the mails.

## IV. FACTS

### A. Background

#### 1. Travel + Leisure's Business

15. Travel + Leisure is a global provider of vacation membership and leisure travel products. On May 31, 2018, the company—then known as Wyndham Worldwide Corporation—changed its name to Wyndham Destinations, Inc. and spun off its hotel business into a separate publicly traded company. After the spin-off, Wyndham Destinations, Inc. became the world's largest vacation ownership (timeshare) company. On January 5, 2021, it acquired the Travel + Leisure brand and subsequently changed its corporate name to Travel + Leisure Co. on February 17, 2021.

16. Travel + Leisure's largest business segment by contribution to revenues is its Vacation Ownership segment, which generates the majority of its revenues from the sales of timeshares. The Vacation Ownership business segment includes the world's largest vacation ownership business with 797,000 owners and more than 280 vacation club resort locations. Travel + Leisure provides timeshare experiences under several brands, including Club Wyndham, WorldMark by Wyndham, Margaritaville Vacation Club, and Accor Vacation Club. Travel + Leisure facilitates the majority of its timeshare sales by providing consumer financing and has financed more than half of its yearly timeshare sales since at least 2014. In 2019, when the Projects began, Travel + Leisure generated 46% of its revenues from the sale of timeshares and 12.7% from consumer financing, and each was a key source of revenue for Travel + Leisure.

#### 2. Relevant Loan Portfolio Concepts

17. Travel + Leisure's violative conduct relates to its timeshare loan portfolio as well as certain performance measures it publicly disclosed concerning estimated defaults associated with the timeshare loans Travel + Leisure finances: (i) the Loan Loss Provision; and (ii) the Loan

Loss Provision Percentage. At the time Travel + Leisure records sales of timeshares, it holds back an estimated amount of revenue it does not expect to collect in the form of the Loan Loss Provision because it knows some customers will not repay their timeshare loans in full. It reduces the revenue Travel + Leisure reports—essentially functioning as a built-in adjustment that accounts for estimated losses. The Loan Loss Provision and Loan Loss Provision Percentage are especially important to investors because Travel + Leisure finances most of its timeshare sales, meaning its business depends heavily on whether customers pay back those loans. When the Loan Loss Provision or Loan Loss Provision Percentage changes, it may signal whether the loan portfolio is getting healthier or riskier.

18. Under Travel + Leisure's own policies, a loan becomes "delinquent" when it is more than 30 days past due, and it is considered "defaulted" when the loan reaches over 120 days past due.

**B. Conditions Leading to the Projects**

19. Travel + Leisure initiated the Projects to address its rising Loan Loss Provision Percentage and defaults. At the time the Projects began, Travel + Leisure was facing a severe threat to the overall and long-term success of its core business from the resurgence of third-party exit companies—for-profit entities that assist timeshare owners in terminating their contracts after the statutory rescission period, often by advising owners to cease making loan payments altogether. The more pervasive third-party exit activity became, the more defaults Travel + Leisure experienced, and the larger its Loan Loss Provision Percentage grew. The trajectory of Travel + Leisure's Loan Loss Provision Percentage served as a critical barometer of how effectively Travel + Leisure was combating third-party exit activity.

20. In late 2018, faced with aggressive third-party exit activity, Travel + Leisure tightened its rescission approval process, categorically denying rescission requests from any

customer suspected of working with a third-party exit company. Rather than stemming the tide of defaults, this draconian approach caused defaults and the Loan Loss Provision Percentage to spike in the first quarter of 2019. Third-party exit activity, together with Travel + Leisure's restrictive rescission approach in late 2018, led to increased defaults and an increase in Loan Loss Provision Percentage amounts in the first quarter of 2019. To offset these negative impacts, Travel + Leisure targeted delinquent and defaulted loans for rescission.

21. At the time of the Projects, Travel + Leisure was on notice that the Loan Loss Provision Percentage was of heightened interest to investors and analysts. During its first earnings call following the spin-off and concerning its fiscal quarter ended June 30, 2018, management stated that the Loan Loss Provision Percentage was "a central area of focus" and "defaults remain higher than we would like." Throughout 2019, Travel + Leisure's investor relations personnel sent management analyst reports conveying that the Loan Loss Provision Percentage would be "consequential for the stock" and a focus of investors.

22. Travel + Leisure was also on notice that even a percentage increase of just 2% in the Loan Loss Provision Percentage would be meaningful to investors and analysts. Travel + Leisure's earnings release for the quarterly period ended March 31, 2019 disclosed a year-over-year increase of just over 2% in its Loan Loss Provision Percentage (i.e., a Loan Loss Provision Percentage of 22.5% in Q1 2019 compared to 20.4% for Q1 2018). On May 1, 2019, during Travel + Leisure's Q1 earnings call, management was met with a series of questions from five analysts regarding the Loan Loss Provision Percentage. In response, management assured analysts that they would stop the trend of year-over-year increases in the Loan Loss Provision Percentage and achieve Travel + Leisure's 2019 guidance of keeping the Loan Loss Provision Percentage comparable to fiscal year 2018.

## C. The Projects

### 1. Overview of the Projects

23. Travel + Leisure began targeting non-performing timeshare loans for rescission in 2019. Under the Projects, Travel + Leisure rescinded en masse financed timeshare contracts of certain customers who wanted to exit their timeshares based on the customers' delinquent or defaulted status, including numerous contracts that it had previously declined to rescind because, for example, the sale did not violate its policies, the complaint was not substantiated, or the customer did not timely submit their rescission request within the statutory period for rescission.

24. Through the Projects, Travel + Leisure rescinded thousands of non-performing loans. In total, Travel + Leisure rescinded, and thereby removed from its loan portfolio, approximately 2,900 delinquent loans totaling approximately $77 million in loan balances, including roughly $34 million of defaulted loans. All of these rescissions occurred after the expiration of the typical statutory period for rescission had expired, making them "late rescissions" under Travel + Leisure's terminology. Travel + Leisure frequently rescinded contracts under the Projects months or years after the original date of sale. When it did so, it reversed the revenue and related accounting entries tied to those contracts in its books, effectively treating the loans as though the original sales and resulting receivables had never been part of its loan portfolio. Although more than half of the contracts were rescinded within a year of the date of sale, approximately 44% were at least a year old when rescinded, and approximately 11% were more than 2 years old when rescinded.

### 2. The SHP

25. Starting in May 2019, Travel + Leisure began targeting delinquent and defaulted timeshare loans for rescission under the SHP. These were loans tied to customers whose prior rescission requests Travel + Leisure had denied or declined to consider. Internally,

Travel + Leisure referred to the rescissions of loans under the SHP as the "Late-Stage Delinquency" rescissions, the "Late Rescissions Project," and/or the "Owner Care Initiatives."

26. Under the SHP, Travel + Leisure focused on rescinding the most severely past due loans first, aiming to rescind them before they reached foreclosure.

27. Employees received lists of delinquent and defaulted loans associated with customers whose earlier rescission requests had been rejected or not acted upon—typically because the requests were made past the statutory rescission window (on average within five to seven days after sale depending on the state), or because the sale process complied with Travel + Leisure's sales policies.

28. The primary purpose of the SHP was to reduce Travel + Leisure's defaults and its Loan Loss Provision Percentage. To do that, Travel + Leisure set specific targets for how many delinquent and defaulted loans it needed to rescind to meet its Loan Loss Provision Percentage guidance. These targets appeared in monthly forecasts from May 2019 through late 2020 and were calculated by determining how many defaults Travel + Leisure had to remove to meet its 2019 guidance and its internal 2020 goals. Senior management agreed on these targets at least quarterly and then directed the responsible departments to carry out the required rescissions.

29. After a contract was coded as a rescission in Travel + Leisure's system, Travel + Leisure reversed all related accounting entries, including the original revenue, the Loan Loss Provision, and, for loans more than 120 days past due, reversed the defaulted amounts. Travel + Leisure reversed these amounts for loans over 120 days past due as well as delinquent loans, including many loans that were within a few days of reaching 120 days past due at the time of rescission. To date, Travel + Leisure has never disclosed the SHP and did not track or disclose its actual impact on its Loan Loss Provision, Loan Loss Provision Percentage, or defaults.

### 3. The PDP

30. Beginning in August 2019, Travel + Leisure began targeting delinquent and defaulted loans for rescission linked to customer complaints under the PDP. The goal was to reduce defaults and lower Travel + Leisure's Loan Loss Provision Percentage.

31. For the PDP, delinquent and defaulted loans were placed into "Past Due Agenda" spreadsheets and distributed before the weekly meetings of the Sales Reversal Committee, which reviewed and made final dispositions on Travel + Leisure's late rescission requests. Unlike most other late rescission requests, PDP loans were not reviewed individually by the Sales Reversal Committee to determine whether the rescission requests should be granted. Instead, every loan on the PDP agendas was approved for rescission without individual review. As with the SHP, once a loan was coded as a rescission, Travel + Leisure reversed the related revenue, Loan Loss Provision, and—if the loan was over 120 days past due—the prior uncollectible amounts.

32. Travel + Leisure stopped targeting delinquent and defaulted loans for rescission under the Projects by the end of August 2020 as timeshare sales fell in the wake of the COVID-19 pandemic. To date, Travel + Leisure has never disclosed the PDP and did not track or disclose its actual impact on its Loan Loss Provision, Loan Loss Provision Percentage, or defaults.

## V. TRAVEL + LEISURE'S MISLEADING STATEMENTS AND OMISSIONS

### A. Misleading Statements and Omissions Concerning the Loan Loss Provision and Loan Loss Provision Percentage

33. On earnings calls and in Commission filings, Travel + Leisure regularly made disclosures concerning increases and decreases in the Loan Loss Provision and Loan Loss Provision Percentage without disclosing how the Projects impacted trends in these measures. These measures were important to investors not only because they concerned the collectability of the timeshare loans Travel + Leisure financed, but also because investors and analysts at the time

viewed these measures as barometers for Travel + Leisure's ability to effectively combat the threat third-party exit companies posed to its core business. But in the disclosures Travel + Leisure provided concerning these measures, it gave no indication that they had been meaningfully improved by the undisclosed rescission Projects, which removed delinquent and defaulted loans from its loan portfolio. As a result, Travel + Leisure's loan portfolio appeared stronger than it truly was.

34. Throughout the Relevant Period, Travel + Leisure presented improving trends in these measures, often emphasizing that its loan portfolio was performing well and that its Loan Loss Provision Percentage was stabilizing or declining. However, Travel + Leisure's public disclosures omitted a critical fact: Travel + Leisure was simultaneously rescinding thousands of delinquent and defaulted loans that removed large volumes of delinquent and defaulted loans from its portfolio.

35. Rescinding thousands of delinquent and defaulted loans had substantial effects on Travel + Leisure's Loan Loss Provision and Loan Loss Provision Percentage. In several quarters, the Projects improved these items by more than five percent. Taking these estimated impacts into account, Travel + Leisure made materially misleading statements and omissions in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in its Forms 10-Q, as well as in earnings releases attached to its Forms 8-K for the fiscal quarters ended September 30, 2019 to September 30, 2020, and in its MD&A sections in its Forms 10-K, as well as in earnings releases attached to its Forms 8-K for the fiscal years ended December 31, 2019 and December 31, 2020. Travel + Leisure also made misleading disclosures of its Loan Loss Provision Percentage on earnings calls for the fiscal quarters ended September 30, 2019, December 31, 2019, September 30, 2020, and December 31, 2020, and the fiscal year ended December 31, 2019.

36. For example, during its third quarter 2019 earnings call, Travel + Leisure's senior officers attributed improvements in its Loan Loss Provision, and expected improvements in the fourth quarter, to various operational initiatives such as a customer care phone line, getting timeshare owners back to taking vacations, stricter underwriting standards, and improvements to its reservation system. They did not, however, disclose the improvements were also driven by the removal of delinquent and defaulted loans through the undisclosed Projects.

37. Travel + Leisure also made misleading statements in several earnings releases by attributing improvements in its Loan Loss Provision Percentage to operational factors while omitting that the undisclosed Projects were responsible for these results. Specifically:

- **October 30, 2019 (Q3 2019):**
  Travel + Leisure disclosed that its Loan Loss Provision Percentage "was 20.3% for the third quarter of 2019, an improvement from 20.8%" during the third quarter of 2018. This was misleading because Travel + Leisure did not disclose that the Projects helped lower the metric and would not have improved compared to the prior year but for the Projects.

- **February 26, 2020 (FY 2019):**
  Travel + Leisure stated it had kept its Loan Loss Provision Percentage "flat" year-over-year and therefore met its guidance. This too was misleading because Travel + Leisure did not disclose that the Projects eliminated certain non-performing loans; without them, it would not have met guidance.

- **May 6, 2020 (Q1 2020):**
  Travel + Leisure told investors its Loan Loss Provision Percentage "would have been" the fourth straight quarter of year-over-year improvement absent COVID-19-related charges. In fact, the metric appeared to improve because Travel + Leisure continued removing delinquent and defaulted loans through the Projects.

38. Improvements to these items can make it appear that fewer customers are being persuaded by third-party exit companies to default on their loans, that credit quality is improving, or that Travel + Leisure's underwriting or collection practices are becoming more effective. However, none of the improvements were solely the result of those practices. By omitting that

these improvements were also driven by the undisclosed removal of thousands of non-performing loans, Travel + Leisure's filings left investors with a misleading picture of the trends impacting the performance of its loan portfolio.

### B. Securities Offered During the Relevant Period

39. During the Relevant Period, Travel + Leisure raised substantial capital through securities offerings that incorporated its misleading Commission filings. These transactions included three private note offerings totaling approximately $1.65 billion, $13.5 million in Travel + Leisure common stock issued in connection with a 2019 acquisition, and $96.8 million in Travel + Leisure common stock issued pursuant to Travel + Leisure's employee stock purchase plan. As a result, Travel + Leisure obtained money from investors while relying on filings and statements that failed to disclose the Projects and their impacts on its Loan Loss Provision and Loan Loss Provision Percentage.

## VI. CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 17(a)(2) of the Securities Act

40. The Commission repeats and realleges Paragraphs 1 through 39 of this Complaint.

41. During the Relevant Period, Travel + Leisure, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

42. By reason of the foregoing, Travel + Leisure, directly or indirectly, violated and unless enjoined, is reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**COUNT II**
**Violations of Section 17(a)(3) of the Securities Act**

43. The Commission repeats and realleges Paragraphs 1 through 39 of this Complaint.

44. During the Relevant Period, Travel + Leisure, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices, and courses of business which have operated as a fraud or deceit upon the purchasers.

45. By reason of the foregoing, Travel + Leisure, directly or indirectly, violated and unless enjoined, is reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**COUNT III**
**Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder**

46. The Commission repeats and realleges Paragraphs 1 through 39 of this Complaint.

47. Travel + Leisure was at all relevant times an issuer that had a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l].

48. Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.13a-1, 13a-11, and 13a-13] thereunder require issuers of registered securities to file with the Commission factually accurate annual, current, and quarterly reports on Forms 10-K, 8-K, and 10-Q, respectively. Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

49. By engaging in the conduct described above, Travel + Leisure failed to file with the Commission such financial reports as the Commission has prescribed, and Travel + Leisure

failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

50. By reason of the foregoing, Travel + Leisure, directly or indirectly, violated and unless enjoined, is reasonably likely to continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 13a-1, 13a-11, and 13a-13].

## VII. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find that Travel + Leisure committed the foregoing violations, and:

### A.
### Permanent Injunction

Issue a permanent injunction enjoining Travel + Leisure and its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them and each of them, from violating, directly or indirectly, Sections 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (a)(3)] and Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 13a-1, 13a-11, and 13a-13].

### B.
### Civil Penalty

Issue an order directing Travel + Leisure to pay a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**C.**
**Further Relief**

Grant such other and further relief as may be necessary and appropriate.

## VIII. DEMAND FOR JURY TRIAL

The Commission demands a trial by jury on any and all issues so triable.

Dated: September 30, 2026

Respectfully submitted,

s/Alice Sum
Alice Sum, Esq.
Senior Trial Counsel
Florida Bar No. 354510
Direct Dial: (305) 416-6293
Email: sumal@sec.gov

Melika Hadziomerovic, Esq.
Senior Counsel
A. No. A5503575
Direct Dial: (305) 416-6277
Email: hadziomerovicm@sec.gov

**ATTORNEYS FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300